UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROBIN KRUEGER,                    )
                                  )
                Plaintiff,        )
                                  )
v.                                )        No. 3:14-CV-289
                                  )        Judge Phillips
HERSCHEND FAMILY                  )
ENTERTAINMENT CORP.,              )
                                  )
                Defendant.        )

## MEMORANDUM OPINION

Plaintiff Robin Krueger asserts several claims arising out of the termination of her seasonal position at the Dollywood Theme Park in 2013. Defendant Herschend Family Entertainment Corp. has filed a motion for summary judgment [Doc. 26] arguing that all of plaintiff's claims should be dismissed as a matter of law. The parties have submitted thorough briefs and supporting documentation [Docs. 27, 28, 29, 30, 31, 32, 33, 34, 36, 42, 43, 44, 45] which the Court has carefully reviewed and considered the arguments of counsel presented on October 21, 2015.

For the reasons set forth herein, the defendant's motion for summary judgment [Doc. 26] will be **GRANTED in part and DENIED in part**.

## I.    Relevant Facts

The Dollywood Company ("Dollywood") is a joint venture between DW Holding Company, LLC, an indirect wholly-owned subsidiary of Herschend Family

Entertainment Corporation ("Herschend") and Dolly Parton Productions, Inc. Dollywood owns the Dollywood Theme Park (the "Park") in Pigeon Forge, Tennessee. Herschend, as a partial owner of Dollywood, operates and manages the Park [Doc. 29 at ¶ 1]. Although Dollywood is operational year-round, the Park's peak business season is late spring, summer, and early fall [*Id.* at ¶ 4]. Many of Dollywood's employees work seasonally during the peak business season [*Id.* at ¶ 5].

Dollywood evaluates its seasonal employees at the end of each season. Dollywood typically offers employment for the following season to successful employees who score 75 points or above on the Seasonal Host Performance Evaluation. These employees receive what is commonly referred to as a "rehire letter" [*Id.* at ¶ 6]. Plaintiff began working seasonally at Dollywood in 2010 [*Id.* at ¶ 7]. She received rehire letters after the 2010 and 2011 seasons [*Id.*].

During the 2010, 2011, and 2012 seasons, plaintiff worked as a Host at the "Imagination Cinema" attraction [Doc. 31-1 at p. 7]. At the end of the 2012 peak season, plaintiff remained at Dollywood and worked through the winter of 2012 [Doc. 31-1 at pp. 7, 8]. On December 21, 2012, plaintiff received a Notice of Unsatisfactory Performance and a three-day suspension. The Notice stated as follows:

> On 12/19/12 you used your cell phone in view of guests against company policy. You also failed to follow the directions of an authorized leader to put away the phone and to clock out. Because of these two violations of company policy, you are being suspended for three days without pay. This suspension will result in a 15 point deduction from your PE which will cause the revocation of your Rehire Letter.

2

[Doc. 31-2]. Thus, as a result of this suspension, plaintiff received an automatic 15-point deduction on her performance evaluation for the 2012 year, which reduced her prior performance score of 86 to 71 [Doc. 29 at ¶ 9]. Plaintiff's performance evaluation score of 71 made her ineligible for rehire in the 2013 season and the rehire letter that Dollywood had previously issued to plaintiff was rescinded [*Id.*].

Pursuant to Dollywood's "Open Door" policy, plaintiff discussed the decision not to issue her a rehire letter with Heather Hyatt, Dollywood's Senior Attractions Manager, and Jason Booth, the Director of Attractions [Doc. 29 at ¶ 10]. Ms. Hyatt and Mr. Booth made the decision to revise plaintiff's performance evaluation score to 77, which was sufficient to allow her to receive a rehire letter for the 2013 season [*Id.*].

At the end of the 2012 season, Dollywood made a business decision to close the Imagination Cinema attraction [Doc. 31-18 at p. 7]. Dollywood provided Hosts who had worked at Imagination Cinema and had received rehire letters, including plaintiff, with a list of attractions that would have openings for the following season. Those Hosts were asked to rank the top two or three attractions to which they preferred to transition [*Id.*]. Plaintiff listed the Smoky Mountain River Rampage ("River Rampage") as her first choice, and Dollywood assigned plaintiff to work as a Host at that attraction during the 2013 season [*Id.*]. The River Rampage is a water-based ride, where guests board circular boats and ride along a simulated white water rafting river [Doc. 31-1 at p. 19].

It is undisputed and unsurprising that safety is an important priority at Dollywood, particularly with respect to a water ride such as the River Rampage [Doc. 31-1 at pp. 8, 21]. Indeed, the Dollywood Host Handbook states in pertinent part:

3

**Safety Is Our No. 1 Priority**
**One of your most important responsibilities is not only your own safety, but also that of your fellow Hosts and Guests. Whatever your job assignment, make safety your No. 1 priority, because safety is non-negotiable at Dollywood.**

[Doc. 31-14 at p. 11.] Dollywood assigns Safety Trainers to each attraction who are responsible for training new and returning Hosts to operate the attraction [Doc. 31-19 at p. 4]. During the 2013 season, Natalia Evans, Jerry Walker, and Carol Davis were Safety Trainers for the River Rampage [Doc. 31-19 at pp. 6—7, 9; Doc. 31-20 at p. 3]. Each attraction, including the River Rampage, also has a Standard Operating Procedures Manual which details the attraction's safety standards, operating procedures, and safety and emergency procedures [Doc. 31-19 at p. 4]. A copy of the safety manual for the River Rampage is kept in the break room at the ride and one copy in the ride's dispatch office [*Id*.].

Plaintiff's employment for the 2013 season began on May 24, 2013 [Doc. 31-1 at p. 20]. On May 24 and 25, 2013, Ms. Davis and Ms. Evans instructed plaintiff on the operation of the River Rampage, although plaintiff described their training as "terrible" and "not really" good [Doc. 31-1 at p. 25]. On May 26, 2013, plaintiff signed an "Attractions Safety Training Plan" on which she initialed that she had learned all of the positions for the River Rampage, that she was "fully trained" and she agreed "to perform only those positions" on which she was certified [Doc. 31-4].

On May 29 and June 1, 2013, Ms. Davis counseled plaintiff about improving her performance [Doc. 31-5]. On June 8, 2013, plaintiff met with Tara Benger, Attractions Supervisor, and Jeff Manning, Attractions Manager, to discuss her concern that she was

4

not receiving enough hours working at River Rampage [Doc. 31-18 at pp. 10, 11—13]. During this meeting, plaintiff told Ms. Benger and Mr. Manning that she did not feel she had been properly trained on how to operate the River Rampage and that it was "the worst training" she had ever received [*Id.* at p. 13; Doc. 31-1 at p. 26]. In light of her statements and her previous agreement that she had been fully trained, plaintiff received a documented verbal warning and was advised that she could not work on the Rampage until she was retrained in all positions, passed retesting, and "re-signed off" due to her statement that she had not been properly trained [Doc. 31-6]. Notably, this warning advised plaintiff, "Do not sign the ride sign-off unless you are positive you have been properly trained" [*Id.*]. Following this verbal warning, Ms. Davis retrained plaintiff on the River Rampage [Doc. 31-18 at p. 15; Doc. 31-20 at p. 4; Doc. 31-1 at p. 26]. On June 12, 2013, plaintiff signed another "Attractions Safety Training Plan" indicating that she had been trained on each position on the River Rampage [Doc. 31-15].

On June 14, 2013, plaintiff was counseled by Ms. Davis for incorrectly catching a boat while working on the River Rampage dock in the load position [Doc. 31-7]. On June 27, 2013, plaintiff was in the break room and was complaining about her schedule in front of several employees [Doc. 31-8; Doc. 31-21 at p. 3]. Team Lead Shannon Hall was in the restroom and overheard plaintiff's comments [Doc. 31-21 at p. 3]. When Ms. Hall exited the restroom and instructed plaintiff to direct any scheduling complaints to her (Ms. Hall), rather than other Hosts, plaintiff "verbally assaulted" Ms. Hall by getting "in her face" and pointing her finger in Ms. Hall's face [*Id.* at p. 4]. Ms. Hall then reported the incident to her Senior Team Lead, Darlene Russell, and they both consulted

5

with the Attractions Manager, Mr. Manning [*Id.* at p. 5]. Mr. Manning decided to send plaintiff home for the remainder of the work day [*Id.* at p. 6]. After further investigating this incident, Dollywood suspended plaintiff on July 2, 2013 for being disrespectful to Ms. Hall [Doc. 31-9].

The Standard Operating Procedures for River Rampage state that "All Guests must wear a shirt and shoes" in order to gain admission to the River Rampage [Doc. 31-16 at p. 7]. These procedures also direct that Hosts working in the "Loader" position must "[c]heck Guests to make sure they have on a shirt and shoes" [*Id.* at p. 17]. Plaintiff admits that guests are not permitted to board River Rampage boats without shoes because the boats have a grate floor which presents a safety hazard to guests whose bare feet could be cut or become stuck on the grate [Doc. 31-1 at p. 21]. On Saturday, July 6, 2013, plaintiff was observed by three other employees allowing a child to board a River Rampage boat without shoes [Doc. 31-19 at p. 11; Doc. 31-11; Doc. 31-18 at p. 19]. Plaintiff admits that she saw the child on the boat without shoes, but says she was not the employee who permitted the child to board. Ms. Benger, Mr. Manning, and Ms. Hyatt conducted an investigation of this incident, which included speaking with the employees who observed it and reviewing the statement of one of the witnesses [Doc. 31-18 at p. 20].

The Standard Operating Procedures for River Rampage also state that Hosts in the Tower Two position must "[w]atch boats as they enter into your view. Remain alert at all times. … Visually follow the boat from Apple Jacks into the Special Effects area. Continually scan your area as other boats will be entering it." [Doc. 31-16 at p. 22.] On

6

July 6, 2013, plaintiff was working in one of the tower positions and was observed with her head down and, therefore, presumably was not watching the boats on the ride [Doc. 31-12]. Mr. Manning observed plaintiff in Tower Two "with her left arm draped over the top of the console with a pencil in her other hand. … The only reason a host would need to be writing any information down in tower 2 is if the ride had added or removed boats[;] they had not during the time I was walking the area." [*Id.*]

Following these apparent safety violations, Dollywood conducted an investigation and decided to terminate plaintiff's employment [Doc. 29 at ¶¶ 16—17]. The decision to terminate plaintiff's employment was made by Dollywood's Human Resources and Attractions departments based on plaintiff's violations of safety procedures and her past disciplinary record [*Id.* at ¶ 17]. Ms. Benger initially recommended plaintiff's termination on July 9, 2013. On July 10, 2013, Mr. Manning, Ms. Hyatt, Mr. Booth, Jay McNeil, Human Resources Director, and Sarai Henning, Senior Human Resources Manager, agreed with that recommendation and decided to terminate plaintiff's employment [*Id.* at ¶ 18]. Dollywood prepared a termination notice dated July 10, 2013 [Doc. 31-13]. The record also contains documentation of six other Hosts terminated by Dollywood during the 2013 season for violating safety protocols and ride operating procedures [Doc. 29 at ¶¶ 19—26].

The Dollywood Safety Team is responsible for the safety and security of all Dollywood guests and employees [Doc. 30 at ¶ 2]. Two Safety Offices are located on the Park property. The main Safety Office is directly behind the River Rampage where the plaintiff was assigned [Doc. 31-19 at pp. 8, 15; Doc. 31-23 at p. 3]. As explained in the

Dollywood Host Handbook, employees who suffer on-the-job injuries while working for Dollywood are responsible for reporting their injury to the Dollywood Safety Office [Doc. 30 at ¶ 3]. When a Dollywood employee reports that they have been injured on the job, the Safety Office provides immediate treatment to the injury, if necessary. If it is determined that the employee needs further medical treatment, the Safety Office provides the employee with an Authorized Physicians Panel list from which the employee may choose to seek treatment [*Id*. at ¶ 4]. The Safety team also manages the workers' compensation process for Dollywood employees who are injured on the job [*Id*. at ¶ 5]. The Host Handbook indicates that the supervisor of an injured Host will "[i]mmediately report ALL injuries to the Claims Administrator," "[t]reat Hosts with respect, dignity and concern," and "[a]ccompany the Host to the appropriate medical provider, if necessary" [Doc. 31-14 at p. 14].

During the period of July 5—11, plaintiff injured her toe by standing in the rain while working. She claims to have mentioned her injury to Ms. Benger, Ms. Davis, and Ms. Hall as early as July 5, 2015. Plaintiff claims that her requests for treatment were ignored or denied. Plaintiff claims she tried to go to the Safety Office on July 9 and July 10, but no one was there. The record contains an email from plaintiff to Ms. Benger and Ms. Hyatt, sent on July 11, 2013, at 5:02 p.m., in which plaintiff states she is on her way to urgent care "because standing in the rain for 3 days and hours at a time on the dock soaking wet my right big toe has swelled up with blisters all over it" [Doc. 32-13].

On July 11, 2013, at 6:59 p.m., Ms. Benger sent a text message to the plaintiff which stated:

> Please meet Heather and myself tomorrow at 10am in HR before you go to the ride. I would like to discuss your concerns and further discuss what we spoke about last Tuesday. As for your raise, it has been taken care of and your retro pay should be on the next check.

[Doc. 31-17]. The purpose of the requested meeting between plaintiff, Ms. Benger, and Ms. Hyatt on July 12, 2013, was to terminate the plaintiff's employment [Doc. 31-18 at p. 21]. At 7:35 p.m. on July 11, plaintiff replied to Ms. Benger's message that she was at the Smoky Mountain Urgent Care to receive treatment for an infection in her toe [Doc. 31-17]. Plaintiff also stated that she had gone "to safety" on the prior day but no one was there [*Id.*]. Plaintiff then explained that she would have to miss some work due to the problem with her toe and that "[w]orking in the rain with wet feet is part of the reason this happened to my foot" [*Id.*]. Ms. Benger reiterated that plaintiff should meet her and Ms. Hyatt the next morning at 10:00 a.m. [*Id.*].

On the day of July 12, 2013, Ms. Benger and Ms. Hyatt met with the plaintiff to convey the decision to terminate her employment [Doc. 31-18 at p. 20]. After plaintiff was advised that her employment was terminated, she showed her toe to Ms. Benger and Ms. Hyatt and asked what Dollywood was going to do about her foot. She claims that Ms. Benger and Ms. Hyatt left the room to talk with Mr. McNeill. Plaintiff then heard Mr. McNeill scream "She's not gettin' a dime and she's not gettin' a claim for Workmen's Comp" [Doc. 31-1 at p. 39].

Prior to the 2013 season, plaintiff suffered an eye injury which she claims has impaired her ability to see in direct sunlight. The Dollywood Safety Team is responsible

for handling employee requests for reasonable accommodation [Doc. 30 at ¶ 9; Doc. 31-18 at p. 4]. With respect to sunglasses, the Dollywood Host Handbook states, in part:

> **Dollywood** Hosts may only wear sunglasses if a physician indicates the eye wear is a medical necessity, in which case the sunglasses must be approved by Safety. **Dollywood** Parking Lot and designated ride attendants may wear sunglasses that are approved by Safety without a physician's approval.

[Doc. 31-14 at p. 50; Doc. 30 at ¶ 11]]. Thus, if plaintiff had a need to wear sunglasses while working on the River Rampage, Dollywood's policy required her to provide a doctor's note to the Safety Team [Doc. 31-19 at pp. 7—8; Doc. 31-22 at p. 3; Doc. 31-23 at p. 6]. The parties dispute whether plaintiff ever presented a doctor's note to the Safety Office requesting an accommodation of sunglasses or if she asked one of her supervisors about wearing sunglasses. However, no such note or documentation has been provided by either party.


## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d

10

937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.


III.    **Analysis**

    A.    Retaliatory Discharge

Plaintiff's first claim for relief asserts that she was discharged in retaliation for exercising her rights under the Tennessee Workers Compensation Law [Doc. 13 at ¶¶ 23—27]. The elements of a common law *prima facie* case for a workers' compensation retaliatory discharge claim are: (1) the plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment. *Yardley v. Hosp. Housekeeping Sys., LLC*, No. M2014-01723-SC-R23-CV, 2015 WL 5545620, at *4 (Tenn. Aug. 21, 2015) (citing *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993), *overruled on other grounds by Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73 (Tenn. 2012)). Dollywood argues that plaintiff cannot show a causal connection between her request for worker's compensation benefits and her termination [Doc. 27 at pp. 9—12].

In order to establish causation, the plaintiff must present some proof other than the facts showing her employment, her exercise of rights under the Workers' Compensation Law, and her subsequent discharge. *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999). The plaintiff may do this by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link. *Id.*; *Campbell v. Eagle Bend Mfg., Inc.*, No. 3:10-CV-24, 2011 WL 2471493, at *5 (E.D. Tenn. June 22, 2011) (Jordan, J.) ("To establish the 'substantial factor' element, "a plaintiff must show either direct or 'compelling circumstantial' evidence of a causal

connection between the workers' compensation claim and the termination, not just the fact that the latter followed the former.") (quoting *Cooper v. Wyndham Vacation Resorts, Inc.*, 570 F. Supp.2d 981, 985 (M.D. Tenn. 2008)). The plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship. *Campbell*, 2011 WL 2471493 at *5. Further, the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge. *Id*. (citing *Reed*, 4 S.W.3d at 685). "The key to a claim for retaliatory discharge under Tennessee workers' compensation law is intent." *Campbell*, 2011 WL 2471493, at * 7 (quoting *Shields v. Fox Television Station, Inc.*, No. 98-6689, 2000 WL 658054, at *4 (6th Cir. May 9, 2000)).

Plaintiff contends that she has presented direct evidence of Dollywood's motivation through the purported remarks of Mr. McNeil. Plaintiff claims that during the termination meeting with Ms. Hyatt and Ms. Benger, she asked them, "what do you plan on doing about my foot?" They went to talk to Mr. McNeil and she claims to have heard him scream, "She's not gettin' a dime and she's not gettin' a claim of Workmen's Comp." The Court accepts this testimony as true for purposes of summary judgment. Dollywood argues that this is not direct evidence of retaliation because it requires the fact-finder to draw inferences in order to conclude that the termination was motivated at least in part by unlawful discrimination. "Direct evidence of discrimination consists of evidence of an employer's conduct or statements which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions." *Williams v. City of Burns*, 465 S.W.3d 96, 121 (Tenn. 2015). "Direct evidence

13

of discrimination 'must establish not only that the plaintiff's employer was predisposed to discriminate …, but also that the employer acted on that predisposition.'" *Momah v. Dominguez*, 239 F. App'x 114, 121 (6th Cir. 2007) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

While this is a close question, the Court concludes that Mr. McNeil's statement does not compel the conclusion that plaintiff was terminated because of her request for workers' compensation benefits. Mr. McNeil expressed animus against her request for workers' compensation benefits, but he did not say that plaintiff was fired because she sought workers' compensation benefits. In other words, his remarks may be evidence of animus against her request for worker's compensation benefits, but they are not evidence that Dollywood acted on that predisposition. Such a conclusion would require an inference and therefore is not direct evidence. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("[t]he need to draw such inferences prevents these remarks from constituting direct evidence of discrimination"). Further, Mr. McNeil was a decisionmaker, but only one of several people involved in the decision to terminate plaintiff's employment. Therefore, his comments cannot constitute direct evidence of discrimination.

Nevertheless, Mr. McNeil's comments constitute circumstantial evidence of causation and retaliatory intent. Circumstantial evidence may include "the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated

employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false." *Jordan v. A.C. Enter., Inc.*, No. E2011-02426-COA-R3-CV, 2012 WL 6562032, at *3 (Tenn. Ct. App. Dec. 17, 2012) (quoting *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006)).   Mr. McNeil's comments demonstrate knowledge of plaintiff's request for compensation benefits and an expression of a negative attitude toward her claim.  Further, plaintiff testified that she first notified a supervisor around July 5 of her injury and that at least four individuals were aware of her condition.  It appears undisputed that no one from Dollywood reported plaintiff's injury or accompanied her to a medical provider, as required by Dollywood's Host Handbook.  Thus, plaintiff has some evidence of the employer's failure to follow company policy regarding work-related injuries.   Finally, plaintiff's termination on July 12 was approximately one week after she first reported her injury.  Thus, plaintiff has shown temporal proximity in addition to other circumstantial evidence that her request for workers' compensation benefits was a substantial factor in Dollywood's decision to terminate her. *Cf. Newcomb*, 222 S.W.3d at 391 ("an employee cannot rely on the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation").

Once the employee has presented a *prima facie* case of retaliation, then the burden of proof shifts to the employer to prove a legitimate, non-pretextual reason for discharging the employee.  *Anderson*, 857 S.W.2d at 558.  Dollywood contends that plaintiff committed multiple safety infractions while working on the River Rampage on

15

July 6 and that, in light of her prior suspensions in December 2012 and June 2013, termination was the appropriate action [Doc. 27 at pp. 12—13]. Plaintiff was observed allowing a child that was not wearing shoes to board a River Rampage boat and she was also observed with her head down and being inattentive while working in the Tower position. Thus, Dollywood argues that the safety infractions were legitimate, non-discriminatory reasons for plaintiff's discharge.

In response, plaintiff contends that Dollywood cannot rely on unsworn witness statements, *i.e.*, hearsay, in support of its motion for summary judgment [Doc. 36 at pp. 19—21]. Specifically, plaintiff points to the statements by Kathleen Hooker and Jeff Manning, which concerned the alleged safety infractions on July 6 [Docs. 31-11, 31-12]. However, as Dollywood correctly points out in its reply brief [Doc. 42 at pp. 4—7], the witness statements are not presented to prove the truth of the matter asserted per Fed. R. Evid. 801(c). Rather, the statements are offered to show Dollywood's state of mind when making the decision to terminate plaintiff, and therefore, the statements are not hearsay. *See King v. Tecumseh Public Schs.*, No. 99-1651, 2000 WL 1256899, at *5 (6th Cir. July 13, 2000); *Khalifa v. Crowell*, No. 95-6485, 1996 WL 742305, at *2 (6th Cir. Dec. 23, 1996); *Haughton v. Orchid Automation Sys., Inc.*, No. 3-03-0768, 2005 WL 1798624, at *6 (M.D. Tenn. July 27, 2005); *Browne v. Signal Mountain Nursery, L.P.*, 286 F. Supp. 2d 904, 924 (E.D. Tenn. 2003) (Collier, J.).

Plaintiff also notes her own testimony in which she disputes that she allowed a child on the boat without shoes. Thus, she contends that there is a disputed issue of material fact as to Dollywood's proffered reason for her discharge. This argument,

16

however, goes to the issue of pretext. Once the employer proffers a legitimate, non-retaliatory reason for the discharge, then the burden shifts back to the plaintiff to prove that the employer's proffered reason was pretextual. *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn. Ct. App. 1999). Pretext may be shown by demonstrating (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the adverse employment action; or (3) that they were insufficient to motivate the adverse employment action. *See Banks v. Argos Risk Mgmt. Servs., LLC*, 963 F. Supp. 2d 778, 788 (M.D. Tenn. 2013) (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F. 3d 444, 460 (6th Cir. 2004)). Inasmuch as plaintiff has presented no evidence that other employees engaged in substantially identical conduct but were not terminated, plaintiff has made no attempt to show pretext by the third method. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The first type of showing pretext is that the proffered reasons never happened, *i.e.*, that they are "factually false." *Id*. Although plaintiff argues that she was not inattentive in the Tower positions on July 6, she does not dispute that a child was permitted to board the River Rampage without shoes; she simply disputes that she was responsible for permitting the child to board. Dollywood argues that plaintiff cannot show pretext by merely disputing the stated reason for her termination when the employer held an honest belief in its reason for the termination [Doc. 27 at pp. 13—16]. "Where the employer honestly believes in the reason given for its employment action, a plaintiff cannot demonstrate pretext 'simply because [the reason] is ultimately shown to be incorrect.'" *Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006) (quoting

17

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). The employer can establish an "honest belief" by showing its "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). "[T]he decisional process used by the employer [need not] be optimal [nor must it leave] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* at 807.

In the present case, Dollywood has presented evidence of witness statements by other employees who saw the alleged safety violations and Ms. Benger's reasonable investigation of both incidents, *i.e.*, the particularized facts that were before Dollywood at the time the decision was made. Nevertheless, the application of the "honest belief" rule is not automatic; the plaintiff has the opportunity to present proof to the contrary. *Id.* In the present case, Ms. Krueger has presented no evidence showing that Dollywood's decisional process is unworthy of credence and that Dollywood did not honestly believe that she committed the alleged safety violations.[1]

Plaintiff does not respond to Dollywood's honest belief argument and instead contends that she has produced evidence of pretext via the second method, that is, the

---

[1]At oral argument, plaintiff's counsel contends that the timing of these events suggests that Dollywood did not really believe she had committed the safety violations. The argument appears to be that if Dollywood really believed plaintiff had committed the safety infractions on July 6, one day after she first reported the problem with her toe, plaintiff would not have been permitted to continue working in a safety-sensitive position until her termination on July 12. However, as defense counsel points out, this argument cuts both ways. If Dollywood had terminated plaintiff without conducting an investigation, defendant would be hard-pressed to assert that it made a "reasonably informed and considered decision" to support its honest belief in the reasons for her termination.

18

purported safety violations did not actually motivate the challenged conduct [Doc. 36 at p. 22].[2]  Using this theory of pretext, "the plaintiff admits the factual basis underlying the discharge and acknowledges that such conduct *could* motivate the dismissal, but attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'"  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (quoting *Manzer*, 29 F.3d at 1084).  In support of this argument, plaintiff points to the lack of response to her requests for treatment for her foot, the statements by Mr. McNeil during the termination meeting ("she's not getting' a dime and she's not getting' a claim for Workmen's Comp"), and the temporal proximity between her requests for workers' compensation benefits and her termination.  While this is the same evidence that plaintiff relied upon in establishing her prima facie case, the Sixth Circuit has recognized "that the same circumstances which established a causal connection between [plaintiff's] protected activity and her termination also serve as sufficient evidence to meet this test."  *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 107 (6th Cir. 2005).[3]  The evidence is slim, but the Court cannot conclude that no reasonable jury could find for plaintiff on this issue.  Accordingly, the Court concludes

---

[2]The honest belief rule does not prevent the plaintiff from establishing pretext through methods other than the falsity of the reason offered.  *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 n.5 (6th Cir. 2006).

[3]The *Cantrell* court noted that the rule from *Manzer* which requires a plaintiff to produce "additional evidence of … discrimination" does not extend to a retaliation claim because a prima facie case of retaliation, unlike a discrimination claim, includes a showing of a causal connection between the protected activity and the adverse employment action.  *Id*. at 107, n.2.  "The overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason is implicitly recognized in our case law, which permits both to be proven by the same type of evidence."  *Id.*

that plaintiff has presented some evidence of pretext and summary judgment will be denied as to this claim.

B.     TPPA Retaliation and Retaliatory Discharge

Plaintiff's second claim for relief asserts that she was discharged in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, for refusing to participate in and/or remain silent about Dollywood's illegal activities, specifically the refusal to process her workers' compensation claim [Doc. 13 at ¶¶ 28—34]. At oral argument, plaintiff's counsel agreed that this claim has been abandoned. Upon review of the record, the Court agrees that summary judgment is appropriate on this claim.

C.     Religious Harassment and Discrimination

Plaintiff's third claim for relief asserts that she was harassed and discriminated against because of her creed and religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, and that she was retaliated against after complaining about such treatment [Doc. 13 at ¶¶ 22, 35—39]. At oral argument, plaintiff's counsel agreed that this claim has been abandoned. Upon review of the record, the Court agrees that summary judgment is appropriate on this claim.

D.     Disability Claims

Plaintiff's fourth claim for relief asserts that she was harassed and discriminated against because of her disability and that Dollywood failed to provide her with a reasonable accommodation of wearing sunglasses due to her disability in violation of the Americans with Disabilities Act Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101,

*et seq.*, and the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-104 [Doc. 13 at ¶¶ 40—46]. At oral argument, plaintiff's counsel admits that her disability claim is based solely on the failure to accommodate under the ADA. Accordingly, the Court will address it as such.

The ADA prohibition on discrimination "against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).[4] In order to establish a prima facie case of a failure to accommodate claim under the ADA, "a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014) (quoting *Johnson v. Cleveland City Sch. Dist.,* 443 F. App'x 974, 982–83 (6th Cir. 2011)). Once a plaintiff establishes a prima facie case, the employer then bears the burden to demonstrate that a particular accommodation would impose an undue hardship. *Johnson*, 443 F. App'x at 983. Notably, "[a]n ADA

_____

[4]It is well settled and plaintiff does not dispute that the TDA does not require employers to make reasonable accommodations for employees that cannot perform the essential functions of their jobs. *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.3 (6th Cir. 2013); *White v. Interstate Distrib. Co.*, 438 F. App'x 415, 419 n.2 (6th Cir. 2011). Thus, plaintiff has not stated a claim under the TDA.

21

plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)).  Dollywood argues that plaintiff was not "disabled" as defined by the ADA and that she did not follow Dollywood's procedures for requesting an accommodation [Doc. 27 at pp. 29—31].

The ADA defines "disability" as including "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).  Dollywood does not dispute that plaintiff has an impairment to her eye, but does dispute that she has presented sufficient evidence to show that the impairment substantially limits a major life activity [Doc. 27 at pp. 29—30].  Referencing plaintiff's testimony that when she was facing the sun her "eye would burn and water" and she used eye drops, Dollywood argues that this is not substantial enough to meet the substantially limited standard [Doc. 31-1 at p. 41].

In response, plaintiff contends that her eye condition substantially limited the major life activities of seeing, concentrating, thinking, and communicating, all of which are identified in the ADA as major life activities, 42 U.S.C. § 12102(2)(A), and that she could not work in direct sunlight without her eye covered [Doc. 36 at p. 32].  Construing the term "broadly in favor of expansive coverage," 29 C.F.R. §1630.2(j)(1)(i), the Court considers plaintiff's ability to perform the referenced major life activities as compared to most people in the general population and conducts an "individualized assessment."  29 C.F.R. § 1630.2(j)(1)(ii) & (iv).  Notably, "[a]n impairment need not prevent, or

22

significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*. at § 1630.2(j)(1)(ii). This is a close question based on limited evidence; however, it appears that plaintiff's ability to see in sunlight, as impacted by a burning and watering eye, was limited as compared to most people in the general population. Accordingly, plaintiff has thus submitted sufficient evidence on this element to survive summary judgment. In contrast, however, plaintiff provides no evidence (or even argument) as to how her eye injury substantially limits her ability to concentrate, think, or communicate. Nevertheless, because plaintiff has presented some evidence that her ability to see was substantially limited, the Court concludes for purposes of summary judgment that plaintiff has established that she was disabled as defined under the ADA.

Next, the Court turns to Dollywood's allegation that plaintiff never filed a proper request for accommodation per Dollywood's procedures. Dollywood points to its Host Handbook which allows Hosts to wear sunglasses "if a physician indicates the eye wear is a medical necessity, in which case the sunglasses must be approved by Safety." Dollywood relies on well-established law that an employer may require supporting medical documentation of an employee's need for reasonable accommodation. *See, e.g., Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000); *Harvey v. America's Collectibles Network, Inc.*, No. 3:09-CV-523, 2011 WL 182864, at *7 (E.D. Tenn. Jan. 20, 2011) (Jordan, J.). Because Dollywood contends that plaintiff never presented a physician's note to the Safety office claiming a medical necessity, she cannot maintain a claim for reasonable accommodation [Doc. 27 at pp. 30—31].

23

In response, plaintiff does not dispute what Dollywood's procedures are for requesting a reasonable accommodation or that the procedures are permissible under the ADA. Instead, plaintiff argues that she did comply with Dollywood's procedures for requesting an accommodation, but she was not provided an accommodation. Plaintiff testified that she did provide a note to the Safety Office which stated that she "should stay away from splashes and direct sunlight" [Doc. 31-1 at p. 35]. Plaintiff also contends that the Safety Office advised her she could wear sunglasses and that she informed Ms. Davis and Ms. Benger of this fact, although she does not provide any citation to the record to support this contention [Doc. 36 at p. 34]. Dollywood replies that plaintiff's testimony on this point is insufficient to defeat summary judgment because of the best evidence rule, *i.e.*, Fed. R. Evid. 1002. Because plaintiff has not produced the purported physician's note and Dollywood's Safety Office has no record of receiving such documentation from her [Doc. 30 at ¶ 13], Dollywood argues that plaintiff's testimony is inadmissible to prove the contents of the writing.

Defendant's argument misses the mark. Fed. R. Evid. 1002 states that "[a]n original writing … is required in order to prove its content." Thus, by its terms, Rule 1002 only applies when evidence is offered to prove the content of a writing. *Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 565 (6th Cir. 2010); *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 598 (6th Cir. 2009). While plaintiff's testimony as to the content of the purported doctor's note would be barred by Rule 1002, her testimony that she had a doctor's note and gave it to the Safety Office would not be. *See Jackim*, 378 F. App'x at 566, n.8 ("any witness with knowledge of facts that exist independent of the

24

contents of a writing, recording, or photograph may testify without raising an issue under Rule 1002") (quoting Wright & Gold, 31 Fed. Prac. & Proc. Evid. § 7184).  Thus, accepting plaintiff's testimony as true for purposes of summary judgment, the Court finds that there is a genuine issue of material fact as to whether plaintiff properly requested a reasonable accommodation.  Summary judgment will be denied on this claim.

E.    FLSA Claim

Finally, plaintiff's fifth claim of relief asserts that she was not paid the minimum wage for the time period of May 24 to May 26, 2013, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, *et seq.* [Doc. 13 at ¶¶ 47—50].  In course of the briefing on this motion, it became evident that to the extent plaintiff had any claim for unpaid wages, that claim was for overtime pay which was not pled in her amended complaint.  At oral argument, plaintiff conceded that she has abandoned this claim and therefore summary judgment is appropriate on this claim.

F.    Mitigation of Damages

Defendant argues that plaintiff's claim for lost wages must be dismissed because she failed to mitigate her damages [Doc. 27 at pp. 34—35].  Specifically, defendant relies on plaintiff's testimony that she was physically unable to work until January or February 2013 and she has not worked or applied for work since that time.  Plaintiff responds that she had secured alternative employment with the Eagle Foundation, but, because Eagle was a lessee of Dollywood, she was not permitted to continue her employment with Eagle after her termination from Dollywood [Doc. 36 at p. 35].  Plaintiff also relies on an affidavit from her family practitioner that plaintiff has been unable to work since her

25

termination from Dollywood due to exacerbation of her anxiety, depression, and PTSD [*Id.*]. In light of this evidence, the Court concludes that there are genuine issues of material fact as to the reasonableness of plaintiff's efforts to secure a substantially equivalent job and that this issue is a matter for the jury. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231—32 (1982). Accordingly, summary judgment will be denied on this issue.


## IV.     Conclusion

For all the reasons set forth herein, the defendant's motion for summary judgment [Doc. 26] will be **GRANTED in part and DENIED in part** whereby the case will proceed solely on plaintiff's claims of retaliatory discharge and failure to accommodate her disability. An appropriate order will be entered.


    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE